[1 Hughes, 541.]

[See Append. Fed. Cas.]

---

## Case No. 2,775.

### The CIVILTA.

[6 Ben. 309.] [1]

District Court, S. D. New York. Jan., 1873. [2]

COLLISION IN THE SOUND—STEAMER AND SCHOONER—TOW-BOAT AND TOW.

1. A schooner was sunk, in Long Island Sound, by a collision with a ship which was at the time being towed at the end of a hawser, by a tug. The night was bright moonlight. The wind was light, from a little west of south, and the schooner was heading about northeast, and going at the rate of from two to three knots an hour. The ship and tug were heading about southwest. The schooner saw the ship and tug a little on her port bow at first, but the tug crossed to her starboard bow

---

[1] [Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed by circuit court (case not reported), and by supreme court in The Civilta v. Perry, 103 U. S. 699.]

when a short distance ahead, and the schooner, keeping on her course, came against the hawser by which the tug was towing the ship, and was then struck on her port side by the ship's stem. The tug was towing the ship at the rate of about seven miles an hour. The ship and tug claimed that the course of the schooner was parallel to theirs, and that, just as she passed the stern of the tug, she ported her helm and so came across the hawser and between the tug and ship, and thus caused the collision. The ship was under the charge of a pilot, who was on board of the ship, but he gave no order to the tug. The hawser by which the ship was towed was about two hundred and fifty feet long. Held, that the ship must be regarded as a ship under steam at the place of collision, because she was moving by steam alone, and her steam power, though two hundred and fifty feet away, was so by her option.

2. It was, therefore, the duty of the schooner to keep her course, and the duty of the ship to keep out of her way.

[Cited in The U. S. Grant, Case No. 16,803; The Jesse Williamson, Jr., Id. 7,296.]

3. On the evidence, the courses of the vessels were nearly end on, and yet drawing across each other, the tug and ship drawing across the course of the schooner from port to starboard.

4. The burden was on the ship to establish that the schooner changed her course. On the evidence, the schooner did not change her course.

5. In the absence of any special instructions from the pilot who was in charge of the ship, to the tug, as to what was to be done on the approach of the schooner, it was the duty of the master to navigate the tug so to take care so to navigate the tug and the ship as to avoid a collision between either and the schooner.

6. Both ship and tug were, therefore, liable.

[See note at end of case.]

[In admiralty. Libel by Augustus B. Perry and others, owners of the schooner Magellan, against the ship Civilta and the steamtug Restless, to recover damages for the sinking of the schooner by collision.]

R. B. Benedict, for libellants.

Beebe, Donohue & Cooke, for the tug and the ship.

BLATCHFORD, District Judge. This is a libel to recover for the damages caused by the sinking of the schooner Magellan, through a collision which took place between that vessel and the ship Civilta, off Hart's Island, at a little after half past two o'clock in the morning, on the 22d of December, 1872. The schooner was bound for Boston, from New York. The ship was in tow of the steamtug Restless, being towed behind her, by a hawser, and was bound to New York, from New Haven. The night was pleasant and lit by the moon. The wind was light, and a little to the west of south. The schooner was sailing free, with her booms off to port, and was making from two to three knots an hour. The ship and tug were making over seven knots an hour. The schooner went safely by the tug, and came in contact with the hawser, and broke it, and then the ship struck the port side of the schooner at about the port fore rigging of the schooner, the schoon-

er's port side being crushed in, and the ship's bowsprit being broken, and the two vessels becoming so entangled that the schooner, when she sank, sank under the ship's bows.

The libel avers, that the schooner was heading about northeast; that the lights of the tug and of the ship were discovered about half a mile off, bearing a little on the port bow of the schooner; that the schooner was kept steadily on her course, without change; that the tug headed for the schooner, until she was very near to the schooner, and then suddenly sheered to port, across the bows of the schooner, and just cleared her, but brought the ship down upon the schooner; that the schooner made no change in her course, and did nothing to cause the collision, and the same could have been easily avoided by the ship and tug, if they had either changed their course earlier, or had changed it to starboard, instead of changing it to port, or had stopped in time; that the schooner could have been seen in abundance of time to enable the tug and ship to avoid her, and she was so seen, but, if she was not, it was in consequence of the want of a lookout, or of negligence on his part; and that the ship was in charge of a pilot, and the collision was caused by negligence on the part of both the ship and the tug.

The answer of the ship sets forth, that the ship had a Hell Gate pilot on board, and was being towed with general instructions from the tug to follow in her wake; that the course of the tug was southwest, that being the regular and proper course, in the neighborhood of Hart's Island, for vessels bound westerly; that the schooner was made ahead and off the starboard bow of the tug, and steering about northeast, and about on a parallel course with the tug and the ship, and on a course which, if continued, would have carried the schooner at a safe distance on the starboard side of the tug and ship; that the schooner passed the tug, the tug having kept steadily on her course; that, when the schooner had thus passed, and when, by keeping steadily on her course, she would, with equal safety, have passed the ship, she kept away to the right, between the tug and the ship, and, although she was repeatedly hailed, from the tug and the ship, as soon as such change was made, to starboard, kept on, and ran upon the hawser by which the ship was being towed, and, by striking it, and by her onward motion, came in contact with the stem of the ship; that, the instant the change of the course of the schooner was seen, the wheel of the tug was starboarded, and she kept off to the left, and the wheel of the ship was promptly starboarded, to follow in the wake of the tug, and, if possible, avoid the schooner, but, owing to the change of the course of the schooner, the collision could not be avoided either by the tug or the ship; that, as the schooner approached the ship, and although careful attention was given, no one could be seen on the deck of the schooner until after the collision, when they were seen hurrying up from below, only partially dressed; that there was no lookout on the schooner, and, if there was any man at the wheel, he was asleep; that the collision was caused by no fault of those navigating on board of the ship, as she was helpless, and steadily followed, as directed, the wake of the tug; that the collision was not by the fault of the tug; and that it was caused by those on board of the schooner, and in charge of her navigation, in, among other things, not having a lookout, and not having a man at the wheel attending properly to his duties, and not seeing the ship in tow of the tug, and changing the course of the schooner, when she had a free wind, and not changing back, when hailed. The answer of the steamtug contains like averments.

The course through Long Island Sound, from the eastward, to a point between Execution Rocks light and Sands' Point light is west southwest, by the coast survey chart. From that point to a point some distance to the westward of where this collision occurred, the course, to the westward, is, by such chart, southwest one-quarter south. The schooner insists that she was heading, by compass, northeast, when she sighted the green and red lights of the tug, and the white bow light of the tug, and two white lights aloft on the tug, and a white light on the foreyard of the ship, and that those lights were sighted bearing from a point to a point and a half on the port bow of the schooner, or, as the libel says, "bearing a little on the port bow of the schooner." The tug and the ship insist that they were heading, by compass, southwest, when they saw the sails and hull of the schooner, but none of her lights, bearing from a point to a point and a half on the starboard bow of the tug and of the ship, or, as the answers say, "ahead and off the starboard bow." The libellants claim that the tug and the ship, from being thus off the port bow of the schooner, drew across her course, she keeping her course, until the tug crossed such course and shut in her red light, so that the tug left the ship in such a position that the schooner, in her onward course, got in between the tug and the ship. The defense claims, that the schooner was on a parallel course with the tug and the ship, and at a sufficient distance off to pass safely to their starboard, and that the schooner, after getting by the tug, ported suddenly, and sheered sharply in between the tug and the ship.

The witnesses on the part of the schooner are Tracy (her mate), who was at her wheel, George Parker (a hand), who was forward on the lookout, Sargent (her master), and Clark Parker (a hand). As the two vessels approached each other, Tracy and George Parker were the only persons on the deck of the schooner. Sargent and Clark Parker were in the cabin. Tracy had taken the

wheel at two o'clock, some thirty to forty minutes before the collision. He had been on the lookout, forward, from one to two o'clock, and, during that hour, George Parker was at the wheel. At two o'clock Tracy and George Parker changed places. Tracy says, that, when he took the wheel, the schooner was a little past the Stepping Stones; that her course, when he took the wheel, was north northeast; and that, as soon as he took the wheel, he changed her course to northeast. The point of change would be about the point where, on the chart, the marked course, going to the westward, changes from south southwest to southwest one quarter south, such marked course being north northeast, from off Throg's Neck, eastwardly, to a little to the eastward of the Stepping Stones, and then northeast one quarter north to a point between Execution Rocks light and Sands' Point light, and then east northeast nearly up to Stratford Point buoy.

Tracy says, that he saw the lights of the tug, namely, her green and red lights, and the white light at her stem, and her two lights aloft, and the light on the foreyard of the ship. all at the same time, bearing about a point, or a point and a half, on his lee, or port, bow; that he saw them before any report was made to him by the lookout, of any light; that the lookout's hail was, "a steamer on your lee bow;" that the tug and ship were then from a half to three-quarters of a mile off, and steering, as he thought, about southwest by south; that, when 50 or 100 yards off, the tug changed her course and went across his bows, to his starboard, and hid her red light; that, up to that time, there had been no change in the course of the schooner, and her helm was then about amidships; that, when the tug showed on his starboard bow, he stepped three or four feet, to the gangway, and called to all hands to come on deck, letting go of the wheel and coming back and taking it again; that there was no change of it while he was gone; that he was steering northeast at the time, by compass; that, when the tug had got her length clear of him on his weather bow, he heard a hail from her, "keep off;" that, at that time, the ship was under his lee, tending a little ahead; that the schooner struck the ship's hawser, and then the two vessels struck each other; that the schooner had up her mainsail, foresail, jib, flying jib and main gaff-topsail; that, up to the time the tug changed her course, he had seen no colored lights on the ship; that, when he first saw the lights, he thought it was a tug towing a vessel; that he heard no whistles from the tug, before the collision; and that, if the tug had kept on, without changing, she would have hit the schooner.

George Parker testifies, that he was forward of the foremast, looking out; that, when he first saw the lights. he saw the side lights, and bow light, and a light aloft,

on the tug, and a light on the ship, from three-quarters of a mile to a mile off, and bearing from one to two points on his lee bow; that he reported to Tracy, "a steamer on the lee bow," and Tracy answered that he saw her; that, when the tug was from 50 to 100 yards off, and her lights were bearing a point or more on his lee, she hid her red light; that, after the tug went by the bow of the schooner, he heard a hail from the tug "keep off;" that he did not leave his place forward until the tug had got within 20 feet; that he saw no colored lights on the ship before the collision; and that he did not hear any whistles from the tug.

Sargent was in the cabin. He did not hear the report of the lookout, or the answer of Tracy, or the whistles from the tug. The first thing he heard was Tracy's call for all hands to come on deck, and then he went out. He says, that, when he got on deck, the ship was under his lee bow, and Sands' Point light was nearly ahead, on the starboard side, between the jib boom and the fore rigging of the schooner; that he and his crew got into a small boat; that he was astern of the schooner, in the boat, and about in a line with the keel of the schooner, when she sank, and then noticed that Sands' Point light bore from two and a half to three points on the starboard bow of the schooner, which would make the schooner head about north northeast when she sank, she not having separated from the ship.

The witnesses for the defence are, Franklin (pilot of the tug, and who was at her wheel in the pilot house), Parks and Milliken (hands on the tug, and who were in the pilot house), Banta (a Hell Gate pilot, who was on the ship, on deck), Valcich (master of the ship, who was on deck), Dik (a hand on the ship, who was on the lookout, forward), Rosa (a hand on the ship, who was steering her by a tiller), and Stanger (mate of the ship, who had been below, but came on deck before the collision, on hearing whistles blown by the tug).

Franklin says, that he first made the schooner probably 700 yards off, and bearing about a point or a point and a half on his starboard bow; that he saw her sails and the shape of her, but saw no lights on her; that he judged her to be heading about northeast; that she passed his bow, on his right, and about from 60 to 100 feet off; that he was steering southwest; that, as the schooner passed him, she changed her course, by putting down her helm, and went in between the tug and the ship, and struck the hawser; that, when he saw that change, he blew five whistles and hailed to the schooner to keep off, that he had a ship in tow, and put his wheel to starboard; that the tug changed her heading one point to the southward, before the collision; that the schooner was heading about southeast when the ship struck her; that, from Sands' Point the tug and ship were in charge of the Hell Gate pi-

lot who was on the ship; and that he had received no orders from that pilot.

Parks and Milliken each give substantially the same testimony as Franklin, in regard to the above matters.

Banta says, that the ship had her colored lights up, and a white light forward; that he was aft near the tiller; that, when he first saw the schooner, the ship was heading southwest, by compass; that he saw the sails of the schooner bearing about a point and a half on his starboard bow, and about 600 yards off; that he saw no lights on the schooner; that he next heard five whistles from the tug, and saw the schooner luffing sharp, and heard a hail from the tug to keep off, and helped to put the tiller of the ship to starboard, and then ran forward, by which time the vessels had struck; that, up to the time of the whistles, he noticed no change in the tug; that, when the vessels struck, the schooner was heading about southeast; that the ship changed only one point by starboarding; that he was pilot of the ship from Sands' Point, and it was his place to hail the tug if her course was not suitable; and that he gave no direction to the tug, and was not close enough to her to give any.

Valcich says, that the first he saw of the schooner was her sails, bearing nearly a point off his starboard bow, and a little on the starboard side of the tug, and from 600 to 700 yards off from the tug; that he saw no lights on her; that he was standing on the forecastle of the ship, and saw the schooner, when she had got nearly past the tug, alter her course more to the southward, by a quick sheer; that, when the schooner changed, the tug blew five whistles, and hailed to the schooner, and he and his lookout hailed to her; that the schooner changed from northeast to southeast; that, when the schooner changed, the tug kept off one point, and the ship starboarded one point; and that he starboarded as the schooner was going across his bow. The above is his version, on his direct examination. On his cross-examination, he says, that he was standing aft when he heard the tug's whistles; that he then saw the ship starboard; that he then went forward; and that, before the ship starboarded, he saw that the tug had changed her course. On his direct examination, again, he reiterates, that he was on the forecastle when he saw the schooner change, and adds, that the schooner changed her course after he heard the whistles of the tug; that, when he heard those whistles, the schooner was heading about northeast; that the tug went off to the southward before the schooner did; that he was running forward when the tug changed; and that he was on the forecastle, on the starboard side, when the schooner changed.

Dik says, that he was on the lookout, on the forecastle of the ship; that he first saw the schooner ahead of the tug, on his star-board bow, and about 20 or 30 fathoms from the tug; that he saw the schooner pass the tug; that, after the tug blew her whistles, the schooner, when a little astern of the tug, changed her course; that, after the schooner changed, the tug changed, to go more to the south; and that he saw no lights on the schooner.

Rosa says, that he had the tiller of the ship, and was steering southwest, when he heard the whistles from the tug; that, soon after that, he saw the schooner crossing his bow; that then he put his helm to starboard, by the order of, and with the aid of, the pilot; that the ship had changed about a point towards the south when the crash came; that he did not see the schooner before he heard the whistles; and that he saw the tug change, when the schooner got across the bow of the ship.

Stanger says, that, while below, he heard the whistles of the tug; that he came up, and looked at the compass; that the ship was then heading southwest; that he then ran forward and saw the schooner astern of the tug, crossing; that he saw the schooner strike the hawser, and was on the forecastle when the vessels struck; that he saw no lights on the schooner; and that, when he got on the forecastle, the tug was keeping to the south.

On the facts proved in this case, the ship must be regarded as a ship under steam, at the place of collision. From Sands' Point, westward, the ship and tug were under the charge and direction, as to navigation, of the pilot on board of the ship, who was in the service of the ship. It is true, that the steam power of the ship was on board of the tug, more than 250 feet away; but, the fact that it was at that distance off was owing to the voluntary action of the pilot, who might have had the tug alongside of the ship, and did put her alongside after the collision. The steam power of the ship, by which alone she was moving, was where the ship chose to have it. If the tug had been alongside of the ship, the two would, in law, have been regarded, quoad the schooner, as one vessel, and that a steam vessel, the motive power being in the tug, and the governing power in the ship. It can make no difference, so far as the rights of the schooner, as against the ship, are concerned, that the tug, at the option of the ship, was 250 feet away (The Cleadon, 14 Moore, P. C. 92, 97). If the schooner did nothing to produce the collision, it was the duty of the ship, as a ship under steam, to keep out of the way of the schooner, and the duty of the schooner to keep her course. The question is, whether the ship failed to discharge that duty, through any fault of the schooner, in not keeping her course, or otherwise. The burden is on the ship, to exculpate herself. In my judgment she has not done so.

The ship sets up, in her answer, that the schooner did not have a lookout. This is sought to be maintained by evidence that he

was not seen from the other vessels. But, it is shown that he was at his post, and reported the tug, and left his post only when it was becoming dangerous for him to remain there.

The ship also sets up, in her answer, that the schooner did not have a man at the wheel, properly attending to his duties, and that, if there was any man at the wheel, he was ·asleep. This is shown, by the evidence, to be a reckless assertion, and void of foundation.

The ship also sets up, that the schooner did not see the ship in tow of the tug. This is disproved by the evidence.

The ship also sets up, that the schooner changed her course at a time and place when otherwise she would have gone safely by the ship, and did not change back, when hailed. It is for the ship to establish this change of course, and to establish it, if made, as one not made in the moment of peril.

The positive evidence from the schooner is to the contrary of any such change. If it is to be taken as absolutely true, that the schooner and the ship were steering opposite and parallel courses, it cannot be true that the tug and ship were seen off the port bow of the schooner, and that, at the same time, the schooner was seen off the starboard bows of the tug and ship. The testimony from each vessel, as to where away she saw the other vessel, is more reliable evidence, when such testimony from both vessels is applied to the case, as to the manner in which the two vessels were approaching each other, than any testimony as to compass courses, particularly where, as here, the vessels were in a comparatively narrow strait, and had lights ahead, the schooner being headed to go between Execution Rocks light and Sands' Point light, and being about two miles away from them, and the tug and ship being headed about for Throg's Neck light, and being about three miles away from it. It is true, that the proper chart courses of the two vessels, in the reach where they met, would be, ·that of the schooner northeast one-quarter north, and that of the ship southwest one-quarter south, and thus directly opposite; but, allowing for a little divergence from such courses, and for a tendency on the part of the witnesses from both vessels to exaggerate, the schooner, the extent to which the ship was on the port bow of the schooner, and the ship, the extent to which the schooner was on the starboard bow of the ship, and the vessels are brought each nearly ahead to the other, and nearly end on, and yet drawing across the courses of each other, the tug and ship drawing across the course of the schooner from the port side of the schooner to the starboard side of the schooner, and the schooner drawing across the course of the tug and ship from their starboard side to their port side, and thus the schooner seeing the tug and ship a little on her port bow, and the tug and ship seeing the schooner a little on their starboard bow. Then again,

the schooner saw both of the colored lights of the tug, up to a time when the tug was but a few feet off from the schooner, and then the green light of the tug remained in view, and her red light went out of view, showing that she must have been nearly ahead to the schooner, but drawing from port to starboard of the schooner. And, in this regard, it is very important to note, that the tug and ship saw no lights on the schooner, although the evidence is that they were set, and properly burning. All that the persons on the tug and ship saw, was the sails and hull of the schooner. If they had seen her colored lights, and observed and described their bearing and movements, we should have been able to see how the schooner was approaching the tug and ship, as we are able to see how the tug and ship were approaching the schooner, from the view had on the schooner of the colored lights of the tug. I conclude, from these considerations, and from the whole evidence, that the schooner did not change her course; that the tug and ship mistook the course of the schooner; that the schooner's course was really drawing on to the course of the tug and ship,⁻in̄ ˙such ˛wise that the two courses were practically end on, where they crossed; that the unchanged courses of the schooner and the ship crossed each other just in advance of the ship, and either between the tug and the ship, or at a point ahead of the tug, so that the tug, by starboarding, avoided striking the schooner; and that the tug and ship, not seeing any colored lights on the schooner, and thus not being able to know which way the schooner was coming, ought not to have kept on, with undiminished speed. The tug did not slow until the schooner got up to her, and did not stop until the schooner was just striking the hawser.

The change attributed to the schooner is a deliberate one, made by porting, to luff into the wind. It is not a change which could have taken place by the leaving of her wheel, because that would have caused her to go to port, by falling off with the wind. The schooner cannot be held in fault for not starboarding, either before being hailed from the tug or after that. She had a right to suppose the tug and ship would avoid her; and the discovery by her that the tug was crossing her bows, and that the ship was getting in her way, was made, and the hail from the tug came, at a time when a collision with the ship was inevitable, so far as there appears to have been any power in the schooner to avoid it by starboarding.

The suggestion that the schooner's lights were not burning, because they were not seen from the tug or ship, cannot control the distinct evidence from the schooner that they were burning. Moreover, it is not set up, in either of the answers, that any want of lights on the schooner misled the tug or the ship, or contributed to the collision. Nor is any allegation to that effect made, in either

of the answers, respecting the non-exhibition of a flash light by the schooner. The ship had her colored lights burning, and yet neither of them was seen from on board of the schooner, before the collision, while all the other lights of the tug, and the white light of the ship, were seen; and the whistles of the tug were not heard on the schooner. It is, therefore, not a strange circumstance, that the schooner's colored lights were not seen.

Is the tug, also, liable for this collision? She was subject to the orders of the pilot in charge of the ship, as is clearly shown. But the tug received no orders from him. While it would have been the general duty of the tug to have followed all orders from the ship, and while the tug would not have been liable, if the collision had resulted from her following improper orders given from the ship, yet, under the actual facts of this case, I think the tug is liable equally with the ship. In the absence of any special instructions from the pilot in charge of the ship, as to what was to be done in view of the approach of the schooner, it was the duty of the master of the tug, knowing, as he did, that, from Sands' Point, the pilot on the ship was in charge, and knowing, also, that the ship was too far behind for orders to be given, and that it was the privilege and duty of the tug to be placed alongside of the ship, where orders could be readily received, to take care so to navigate the tug and the ship as to avoid a collision between either and the schooner. The Secret, 8 Mitch. Mar. Reg. 116. If the collision had happened to the eastward of Sands' Point, the tug would clearly have been liable, and the ship not liable. The fact that the ship is held liable for this collision, for the reasons before given, cannot exonerate the tug from responsibility for not practically giving the charge up to the ship, by taking the ship alongside from Sands' Point, and for leaving the state of things, as regarded the relations of the tug to the schooner, to continue the same as they were before the tug and ship reached Sands' Point.

There must be a decree for the libellants, against both vessels, with costs, with a reference to a commissioner to ascertain the damages sustained by the libellants.

[NOTE. The claimant of the ship, Casimir Casulich, and the owner of the tug, John R. Baker, appealed from the decree herein to the circuit court, which affirmed the district court decree in an unreported case. Claimants then appealed to the supreme court.

[Both ship and tug were in fault. Those on board mistook the course of the schooner and failed to observe her lights, although they were properly set and burning brightly, and took no steps in time to avoid the collision. Both were responsible for the navigation,—the ship, because her pilot was in general charge; and the tug, because of the duty which rested on her to act upon her own responsibility in the situation in which she was placed. The tug was in fault in failing of her own motion to change her course so as to keep both herself and the ship out of the way; and the ship was in fault because the pilot, who was likewise in

charge of the tug, neglected to give her the necessary directions, when he saw or ought to have seen, that no precautions were taken by the tug to avoid the approaching danger. Mr. Chief Justice Waite delivering the opinion of the court in The Civilita and The Restless, 103 U. S. 699.]